Pedram Esfandiary (SBN: 312569)
pesfandiary@baumhedlundlaw.com
Monique Alarcon, Esq. (SBN: 311650)
malarcon@baumhedlundlaw.com
Timothy A. Loranger, Esq. (225422)
tloranger@baumhedlundlaw.com
Ronald M. Goldman, Esq. (SBN: 33422)
rgoldman@baumhedlundlaw.com
**BAUM HEDLUND, ARISTEI, &
GOLDMAN, P.C.**
10940 Wilshire Blvd., Suite 1600
Los Angeles, CA 90024
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CJ MONTANO,<br><br>       Plaintiff<br><br>    v.<br><br>CITY OF LOS ANGELES; COUNTY OF LOS ANGELES; CHIEF MICHEL MOORE; SHERIFF ALEXANDER VILLANUEVA; MICHAEL RIMKUNAS; RODOLFO ALVARADO BERMUDEZ; MELVIN MARTINEZ; CARLOS CRUZ; DANIEL BUNCH; SHANNON K. PAULSON; GUSTAVO GUTIERREZ; and DOES 7-10 inclusive,<br><br>       Defendants. | **CASE NO.** 2:20-cv-07241-CBM (ASx)<br><br>Hon. Consuelo B. Marshall<br><br>Hon. Alka Sagar<br><br>**SECOND AMENDED COMPLAINT**<br><br>42 U.S.C. § 1983: FIRST, FOURTH, & FOURTEENTH AMENDMENTS;<br>CAL. CONST. ARTICLE I, §§ 2, 3, 13;<br>CAL. CIV. CODE §§ 52.1;<br>COMMON LAW TORT CLAIMS<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................i

INTRODUCTION ..................................................................................................1

JURISDICTION AND VENUE .............................................................................1

PARTIES................................................................................................................2

    I.    Plaintiff....................................................................................................2

    II.   Defendants..............................................................................................2

FACTS...................................................................................................................6

    I.    The Violent Response of Law Enforcement to Peaceful Protests; the Militarized Policing Culture Perpetuated by the Defendant City and County; and the Nefarious Sub-Culture of "Sheriff's Gangs" in the LASD ...............................................................................................................6

        A.    Law Enforcement Response in the Wake of Recent Protests..........6

        B.    The Subculture of "Sherriff Gangs" Within the LASD .................10

    II.   Plaintiff Is Severely Injured By Rubber Bullets While Peacefully Protesting.............................................................................................13

MONELL ALLEGATIONS.................................................................................19

    I.    The Settlement in *National Lawyers Guild v. City of Los Angeles* ..........23

    II.   The Settlement in *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* ("*MIWON*") ....................................................................23

PUNITIVE/EXEMPLARY DAMAGES ALLEGATIONS ..................................26

(Against individual Defendants Moore, Villanueva, Rimkunas, and Does 1-10) ..26

EXHAUSTION OF ADMINISTRATIVE REMEDIES ......................................26

FIRST CAUSE OF ACTION ..............................................................................27

Free Speech and Assembly ................................................................................27

First & Fourteenth Amendments (42 U.S.C. § 1983);.........................................27

California Constitution, Article I, §§ 2 & 3 ........................................................27

SECOND CAUSE OF ACTION .........................................................................28

Unlawful Seizure & Excessive Force .................................................................28

Fourth & Fourteenth Amendments (42 U.S.C. § 1983); .....................................28

California Constitution, Article I, § 13 ...............................................................28

THIRD CAUSE OF ACTION..............................................................................30

**Substantive Due Process** ............................................................**30**

**Fourteenth Amendment (42 U.S.C. § 1983);** ...........................**30**

**California Constitution, Article I, § 13** ................................**30**

**FOURTH CAUSE OF ACTION** ...............................................**31**

**Violation of Bane Act (California Civil Code § 52.1)** ............**31**

**FIFTH CAUSE OF ACTION** ...................................................**32**

**Assault** .........................................................................................**32**

**SIXTH CAUSE OF ACTION** ...................................................**33**

**Battery** .........................................................................................**33**

**SEVENTH CAUSE OF ACTION** ............................................**34**

**Negligence** ...................................................................................**34**

**REQUEST FOR RELIEF** .........................................................**36**

**INTRODUCTION**

1.      This action arises out of the unlawful use of force against Plaintiff CJ Montano during a peaceful protest in the Fairfax District of the City of Los Angeles on Saturday, May 30, 2020.  Plaintiff was present at a demonstration organized, in part, by Black Lives Matter Los Angeles to decry ongoing police violence perpetuated against communities of color, particularly Black people, across the United States.

2.      Plaintiff's participation in the peaceful exercise of freedom of speech and assembly on the afternoon of May 30 turned into a violent nightmare due to the escalatory and dangerous crowd control tactics employed by the City of Los Angeles and County of Los Angeles—through the Los Angeles Police Department and the Los Angeles County Sheriff's Department and its personnel Chief Michel Moore; Sheriff Alexander Villanueva; and LAPD Officers Rimkunas, Alvarado, Martinez, Cruz, Bunch, Paulson, and Gutierrez—resulting in plaintiff suffering severe physical injuries following unprovoked use of so-called "less lethal" projectiles by law enforcement personnel.

3.      Defendants' improper and unlawful crowd-control tactics violated plaintiff's rights under the U.S. and California Constitutions, as well as plaintiff's statutory and common law rights.  Accordingly, this lawsuit seeks to hold defendants, and each of them, accountable for plaintiff's life-threatening injuries and to put an end to each defendants' unconstitutional conduct.

**JURISDICTION AND VENUE**

4.      This case is brought pursuant to 42 U.S.C. §§ 1983.  Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 and 1343.  This Court also has supplemental jurisdiction over plaintiff's state law claims and over defendants pursuant to 42 U.S.C. § 1367.

5.      This Court has the authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Federal Rules of

FIRST AMENDED COMPLAINT

Civil Procedure 57 and 65, including pursuant to the Court's inherent equitable powers.

6.     Venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all defendants reside within this district and the events and omissions giving rise to plaintiff's claims occurred within this district.

## PARTIES

### I.     Plaintiff

7.     Plaintiff **CJ Montano** ("plaintiff") is a Marine Veteran and current music student at the Los Angeles Recording School.  Plaintiff is, and at all times material hereto was, a resident of Los Angeles County.

### II.     Defendants

8.     Defendant **City of Los Angeles** ("City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of California.  The Los Angeles Police Department ("LAPD") is a local government entity and an agency of the City, and all actions of the LAPD are the legal responsibility of the City.  The City is charged by law with the administration and operation of the LAPD, including the employment, control, supervision, discipline, training, and practices of LAPD's personnel and employees, and with the formulation of its policies, practices, and customs of LAPD's personnel and employees.  The City is sued in its own right on the basis of its policies, customs, and practices which gave rise to plaintiff's federal rights claims, as well as on the basis of *respondent superior*, under California Government Code § 815.2, for plaintiff's state law claims.

9.     Defendant **County of Los Angeles** ("County") is a county of the State of California duly organized and existing under the Constitution and laws of the State of California.  The County is charged by law with the administration and operation of the Los Angeles County Sheriff's Department ("LASD"), including the employment, control, supervision, discipline, training, and practices of LASD's personnel and employees and with the formulation of its policies, practices, and customs of LASD's

FIRST AMENDED COMPLAINT

personnel and employees.  The County is sued in its own right on the basis of its policies, customs, and practices which gave rise to plaintiff's federal rights claims, as well as on the basis of *respondent superior*, under California Government Code § 815.2, for plaintiff's state law claims.

10.  Defendant **Chief Michel Moore** ("Moore") is, and at all times material hereto was, the LAPD police chief and a policymaker for his department.  Upon information and belief, Moore was present in person at the demonstration in the Fairfax District on May 30, 2020 when plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  He is sued in both his individual and official capacities.

11.  Defendant **Sheriff Alexander Villanueva** ("Villanueva") is, and at all times material hereto was, the LASD sheriff and a policymaker for his department.  He is sued in both his individual and official capacities.

12.  Defendant **Michael Rimkunas** ("Rimkunas") is, and at all times material hereto was, a Commander with the LAPD and assigned to the position of Assistant Director of the Office of Operations.  Rimkunas served as the Incident/Watch Commander during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Rimkunas participated in recommending and authorizing the deployment of "less lethal" munitions that injured plaintiff.  He is sued in both his individual and official capacities.

13.  Defendant **RODOLFO ALVARADO BERMUDEZ** ("Alvarado") is, and at all times material hereto was, an LAPD officer assigned to LAPD's Olympic Division.  Officer Alvarado was present during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Officer Alvarado deployed the "less lethal" munition that injured plaintiff.  He is sued in both his individual and official capacities.  Defendant Alvarado was previously identified as Doe 1.

14.     Defendant **MELVIN MARTINEZ** ("Martinez") is, and at all times material hereto was, an LAPD officer assigned to LAPD's Olympic Division.  Officer Martinez was present during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Officer Alvarado deployed the "less lethal" munition that injured plaintiff.  He is sued in both his individual and official capacities. Defendant Martinez was previously identified as Doe 2.

15.     Defendant **CARLOS CRUZ** ("Cruz") is, and at all times material hereto was, an LAPD Sergeant assigned to LAPD's Olympic Division.  Sergeant Cruz was present during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Sergeant Cruz participated in recommending and authorizing the deployment of "less lethal" munitions that injured plaintiff.  He is sued in both his individual and official capacities. Defendant Cruz was previously identified as Doe 3.

16.     Defendant **DANIEL BUNCH** ("Bunch") is, and at all times material hereto was, an LAPD Sergeant assigned to LAPD's Foothill Division.  Sergeant Bunch was present during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Sergeant Bunch participated in recommending and authorizing the deployment of "less lethal" munitions that injured plaintiff.  He is sued in both his individual and official capacities. Defendant Bunch was previously identified as Doe 4.

17.     Defendant **SHANNON K. PAULSON** ("Paulson") is, and at all times material hereto was, an LAPD Captain III assigned to LAPD's Wilshire Division.  Captain Paulson was present during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Captain Paulson participated in recommending and authorizing the deployment of "less lethal" munitions that injured plaintiff.  She is sued in both her

individual and official capacities. Defendant Paulson was previously identified as Doe 5.

18.    Defendant **GUSTAVO GUTIERREZ** ("Gutierrez") is, and at all times material hereto was, an LAPD Sergeant assigned to LAPD's Metropolitan Division. Sergeant Gutierrez was present during the May 30, 2020 Fairfax demonstration during which plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  Sergeant Gutierrez participated in recommending and authorizing the deployment of "less lethal" munitions that injured plaintiff.  He is sued in both his individual and official capacities. Defendant Gutierrez was previously identified as Doe 6.

19.    The identities, capacities, and/or nature of involvement of the defendants sued as **DOES 7 through 10** are presently unknown to plaintiff who therefore sues these defendants by fictitious names.  Plaintiff is informed, believes, and thereupon alleges that DOES 7 through 10 include individual law enforcement personnel employed by the LAPD and LASD that were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein.  Plaintiff will amend this complaint to substitute the Doe defendants' true names and capacities when they have been ascertained.  Plaintiff is informed, believes, and thereupon alleges that each Doe defendant is a resident of California.

20.    Each of the defendants, including the Doe defendants, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by plaintiff by, among other things, personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct, by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to address the constitutional rights of protesters despite the obvious need for such a policy; and by

FIRST AMENDED COMPLAINT

ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

21.     Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, defendants, and each of them, acted as the agents, servants, and employees of each of the other defendants.

22.     In doing each of the acts and/or omissions alleged herein, defendants, and each of them, acted within the course and scope of their employment.

23.     In doing each of the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under the color of law.

## FACTS

**I.    The Violent Response of Law Enforcement to Peaceful Protests; the Militarized Policing Culture Perpetuated by the City and County; and the Nefarious Sub-Culture of "Sheriff's Gangs" in the LASD**

### A. Law Enforcement Response in the Wake of Recent Protests

24.     The recent brutal murders of George Floyd, Breonna Taylor and Ahmaud Arbery—the culmination of historical police oppression of the Black community—brought the United States to a crossroads.

25.     Upon the passing of George Floyd, residents of Minneapolis (where Mr. Floyd was murdered) took to the streets to denounce systemic racism and the history of violence which has targeted Black lives.  Soon, hundreds of thousands of demonstrators across the country—in cities and towns large and small—joined Minneapolis in demanding immediate change, including the residents of Los Angeles County where, over the past 20 years, it is estimated that law enforcement has killed about three to four people each month.[1]

---

[1] *Los Angeles Police Killings Database* (LA TIMES, June 9, 2020), available at: https://www.latimes.com/projects/los-angeles-police-killings-database/.

FIRST AMENDED COMPLAINT

26.     The City and County are already subjects of numerous lawsuits challenging the unlawful use of force and detention against unarmed protesters.[2]  Much of the complaints alleging excessive force have centered on the deployment of so called "less lethal munitions" ("LLM")  and weapons, including such things as rubber bullets, batons, tasers, and pepper spray.

27.     "Less lethal" or "non-lethal" weapons are a deceptively monikered group of arms utilized by law enforcement for crowd control ostensibly without the intention to cause death.  Although such weapons are less likely to kill the target than are conventional weapons such as firearms that shoot bullets, their use and misuse can result in serious and permanent bodily harm, and have also caused death.[3]

28.     This excessive and unlawful use of force against peaceful demonstrators is a deliberate, first-line tactic which is embedded in the institutional culture of the City and County.

29.     "[I]n most cases killing is just not that big of a deal"[4] is a cavalier sentiment expressed by Dave Grossman while instructing law enforcement personnel in "Killology", a neologism coined by Grossman to describe "the scholarly study of

---

[2] *See, e.g., LAPD Sued by Black Lives Matter-LA in Federal Court Over Mass Detention* (LA DAILY NEWS, June 5, 2020), available at: https://www.dailynews.com/2020/06/05/lapd-sued-by-black-lives-matter-la-in-federal-court-over-mass-detention/; *Peaceful Protestor Hit by LAPD Vehicle Files Government Claim* (PR Newswire, June 5, 2020), available at: https://www.prnewswire.com/news-releases/peaceful-protestor-hit-by-lapd-vehicle-files-government-claim-301071482.html

[3] *See* United Nations Public Order Management, *Less Than Lethal Weapons* (UN Peacekeeping PDT Standards for Formed Police Units, 1st Edn. 2015), available at: http://repository.un.org/bitstream/handle/11176/387390/Less%20Than%20Lethal%20Weapons.pdf#page=7.  LLMs include rubber bullets; rubber buckshot; soft polymer rounds; wax bullets; plastic bullets; beanbag rounds; sponge grenades; ring airfoil projectiles (both kinetic and tear gas projectiles); and rubber bullets with electroshock effect (e.g. Taser XREP rounds).

[4] *"Enjoy the Killing"* Do Not Resist at 0:20 (YOUTUBE, March 1, 2019), available at: https://www.youtube.com/watch?v=PwEYhIX4cbM&t=22s.

7

FIRST AMENDED COMPLAINT

the destructive act".[5]   A former Army Ranger, Grossman prides himself as an authority on aggression and devotes his time to traveling throughout the country teaching law enforcement personnel on how to become more effective killers.  His books on the subject are required reading at the FBI academy and police academies across the U.S.[6] In essence, Grossman's philosophy—expounded using fear mongering imagery to characterize those killed by law enforcement as "terrorists" and "gang bangers"— advocates a "warrior" mentality amongst law enforcement that does not hesitate to use deadly force or regret its consequences.[7]  And, not without correlative results.  The officer who murdered Philando Castile in 2016 had taken a class with Grossman just two years before the shooting.[8]

30.     The City enrolled some 600 LAPD personnel in one of Grossman's "trainings" where, reportedly, a LAPD detective informed Grossman that he was the first individual in twenty years to tell her: "it's ok. That [sic] not feel bad about killing that guy."[9]  Upon information and belief, the City—through the LAPD—has hosted Grossman's trainings for its law enforcement personnel on numerous occasions over the years.

31.     In May 2009, the California Homeland Security Response Conference, held in Palm Springs, California and chaired by LAPD Deputy Chief Michael Downing and including LASD Detective Don Lord; LAPD Officer Jim Buck; and Jon

---

[5] *See* https://www.grossmanacademy.com/about-the-colonel.

[6] *See "Are You Prepared to Kill Somebody?" A Day With One of America's Most Popular Police Trainers* (MOTHER JONES, March, 2017), available at: https://www.motherjones.com/politics/2017/02/dave-grossman-training-police-militarization/

[7] Kelly McLaughlin, *One of America's Most Popular Police Trainers is Teaching Officers How to Kill* (INSIDER, June 2, 2020), available at: https://www.insider.com/bulletproof-dave-grossman-police-trainer-teaching-officers-how-to-kill-2020-6

[8] *Id.*

[9] *"Enjoy the Killing"* Do Not Resist at 1:12 (YOUTUBE, March 1, 2019), available at: https://www.youtube.com/watch?v=PwEYhIX4cbM&t=22s.

FIRST AMENDED COMPLAINT

A. Winstanley of the LAPD Counter Terrorism & Criminal Intelligence Bureau as part of its Steering Committee, hosted training sessions by Grossman titled "Terrorism and Human Aggression" and "Bullet Proof Mind" for the City and County's law enforcement personnel.[10]  This training was organized, supervised, and ratified by the City and County.  Upon information and belief, the County—through LASD—has hosted Grossman's trainings for its law enforcement personnel on numerous occasions over the years.

32.    Grossman's dangerous pseudo-scientific pontifications—which have been widely disseminated by the City and County to its law enforcement personnel—are part and parcel of a larger industry of militarized and fear-based law enforcement educators such as psychologist William Lewinski, whose work has been roundly rejected by the scientific community.[11]

33.    This "shoot first" mentality is endemic within the LAPD and LASD and perpetuated by the policies, practices, and customs of the City and County, directly contributing to the disastrous and tragic outcomes when the LAPD and LASD are deployed in response to peaceful protesters—such as plaintiff—exercising their Constitutional rights.

34.    The City has a long, troubled history of employing unlawful suppression tactics in response to protests.[12]  Over the course of the last several decades, the City has been sued repeatedly for much of the same conduct challenged herein, including

_____

[10] CFED, California Homeland Security Response Conference (May 13-2009), Conference Agenda at 3, 6, 7, available at: http://lib.store.yahoo.net/lib/yhst-129183456818554/cfed-west.pdf.

[11] Zachary Siegel, *Is the Psychology of Deadly Force Ready for the Courts?* (SCIENTIFIC AMERICAN, December 20, 2018), available at: https://www.scientificamerican.com/article/is-the-psychology-of-deadly-force-ready-for-the-courts/

[12] *See LAPD Violence Against George Floyd Protests Erodes A Decade of Reforms* (LA TIMES, June 14, 2020), available at: https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics

FIRST AMENDED COMPLAINT

excessive force with rubber bullets.  For example, on May 1, 2007, the LAPD engaged in a substantially similar use of the same type of unlawful force complained of herein against peaceful marchers in the MacArthur Park area of the City of Los Angeles, resulting in a subsequent class action lawsuit and Structural Relief Order being issued which set forth specific grounds for the use of LLMs when the LAPD engages in crowd control.  *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* (C.D. Ca. CV 07-3072 AHM).  As discussed below, the City utterly failed to follow the mandates of the Structural Relief Order in the instant matter.

### B. The Subculture of "Sheriff Gangs" Within the LASD

35.    The County and Villanueva have repeatedly failed to address a nefarious element infecting the rank and file of the LASD, namely the presence of "sheriff gangs" which is contributing to the ongoing use of excessive force against members of the public.  In 2019, the Federal Bureau of Investigation ("FBI") launched an investigation into the County following repeated allegations of shootings, beatings, and harassment by members of the "Banditos", a group of LASD deputies assigned to the Department's East L.A. station.[13]

36.    The Banditos, readily identifiable by their distinctive matching tattoos of a skeleton outfitted with a sombrero, bandolier and pistol, have been allowed to operate with impunity by Villanueva and the County for years, resulting in a pattern of continued violence against the community that the Sheriff is otherwise sworn to protect.[14]

---

[13] Maya Lau & Joel Rubin, *FBI investigating tattooed deputy gangs in Los Angeles County Sheriff's Department* (LA Times, July 11, 2019), available at: https://www.latimes.com/local/lanow/la-me-fbi-investigating-sheriff-20190711-story.html

[14] *Father Sues For Fatal Shooting of Son - By East L.A. Deputy Who is Allegedly 'Banditos' Member* (The Eastsider, June 26, 2020), available at: https://www.theeastsiderla.com/neighborhoods/east_los_angeles/father-sues-for-fatal-shooting-of-son---by-east-l-a-deputy-who/article_e15233f4-b7f5-11ea-96e5-db92cda23b87.html

FIRST AMENDED COMPLAINT

37.     However, this is not an insular subculture within the LASD.  Rather, the LASD and County have a long and well documented history of being permeated by criminal street gangs formed by some of their own deputies and sergeants.  The violent gang culture is so ingrained in the LASD that many of the department's employees, including Villanueva, have either turned a blind eye, or simply come to accept the gangs as the status quo.  The sheriff gangs include the "Reapers", "Jump Out Boys", the "3000 Boys" (whose members earned their tattoos—their "ink"—by breaking the bones of inmates),[15] the "Spartans", the "Regulators", "Vikings", the "Pirates", and the above-mentioned Banditos.

38.     In 1991, following a lawsuit against the County for the illegal activities of the Vikings—alleged to have terrorized the community, encouraged excessive force, and rewarded deputies for shooting civilians—U.S. District Judge Terry J. Hatter Jr. concluded that the Vikings were a "neo-Nazi, white supremacist gang" that operated under leaders who "tacitly authorize deputies' unconstitutional behavior."[16]  In 1992, a watchdog panel, the Kolts Commission, pressed the County to root out the gangs.[17] The Kolts Commission, created in response to uproar over excessive force by deputies, conducted a sweeping inquiry into the LASD and recommended in 1992 that officials

---

[15] It has been alleged that one of the deputies involved in the recent murder of Andres Guardado in Gardena, California is a member of the 3000 boys.  *See Attorneys Allege Deputy Present At Fatal Shooting Of Andres Guardado Is Member Of LASD Gang* (CBS Los Angeles, July 10, 2020), available at: https://losangeles.cbslocal.com/video/4623129-attorneys-allege-deputy-present-at-fatal-shooting-of-andres-guardado-is-member-of-lasd-gang/.

[16] Hector Tobar, *Deputies in 'Neo-Nazi' Gang, Judge Found: Sheriff's Department: Many at Lynwood Office Have Engaged in Racially Motivated Violence Against Blacks and Latinos, Jurist Wrote* (LA TIMES, October 12, 1991), available at: https://www.latimes.com/archives/la-xpm-1991-10-12-me-107-story.html

[17] LA Times Editorial Board, *Are LASD Gangs Terrorizing Communities? L.A. County Has No Idea. It Better Find Out* (LA TIMES, March 30, 2019), available at: https://www.latimes.com/opinion/editorials/la-ed-sheriff-deputy-tattoos-20190330-story.html.

11

FIRST AMENDED COMPLAINT

investigate and punish deputies who act like gang members.[18]  The County refused to follow the Kolts Commission's advice, and Villanueva has failed to take responsive action or even acknowledge the presence of the gangs.[19]

39.  Not surprisingly, two decades after the Kolts Commission report, a blue-ribbon commission, the Citizens' Commission on Jail Violence, noted a culture of tolerance and even "tacit approval" of "violent cliques [gangs]."[20]  The Commission sharply criticized the Department for turning a blind eye to the problem and allowing the gangs to use excessive force to the point of causing grievous bodily harm to members of the public.  The Commission emphasized that the County "has known about and failed to address the longstanding problem of deputy cliques."[21]  Again, the report was, and at all times herein relevant continues to be, ignored by the County.

40.  The findings of the Citizen's Report were reaffirmed in April 2019—during the tenure of Villanueva—by the County's own Board of Supervisors, who acknowledged that the LASD has a "long and troubled history" of "exclusive and secretive Department groups consisting of sworn deputies" who have engaged in "intimidating gang-like behavior", "harassment" and violence.[22]  The Board further noted that the County "has not been terribly effective in investigating, or thwarting the rise of sheriff gangs, and this ambivalence has likely enabled their continuation and expansion" and that "actions of these groups have actively harmed residents of the

---

[18] Special Counsel James Kolts & Staff, *The Los Angeles County Sheriff's Department* (July 1992), available at: https://www.clearinghouse.net/chDocs/public/PN-CA-0001-0023.pdf.
[19] *See* LA Times Editorial Board, *supra* at fn. 19.
[20] Los Angeles County, *Report of the Citizen's Commission on Jail Violence* (September 2012) at 101, available at: https://ccjv.lacounty.gov/wp-content/uploads/2012/09/CCJV-Report.pdf.
[21] *Id*. at 67.
[22] Motion by Supervisors Sheila Kuehl and Hilda L. Solis*, Assessing County Liability in Settlements Involving Sheriff "Gangs"* (April 30, 2019) at *2, available at: http://file.lacounty.gov/SDSInter/bos/supdocs/135078.pdf.

FIRST AMENDED COMPLAINT

County, other Sheriff's deputies, and have cost the County millions of dollars in lawsuits and settlements."[23]

41.     In sum, the unlawful use of force against the public by LASD deputies comes, partly, as a direct result of the County and Villanueva failing to address the entrenched gang culture within the LASD.  This willful disregard by the County and Villanueva is part of a larger pattern, practice, and custom that created the conditions which resulted in plaintiff's injuries.

**II.    Plaintiff Is Severely Injured By Rubber Bullets While Peacefully Protesting**

42.     On Saturday May 30, 2020, plaintiff attended an organized demonstration at Pan Pacific Park to exercise his right to peacefully protest the Minneapolis Police Department's murder of George Floyd and decry police misconduct nationwide.  Pan Pacific Park is located at 7600 Beverly Boulevard in what is known as the Fairfax District of the City of Los Angeles.

43.     Plaintiff arrived at Pan Pacific Park at approximately 12:45 pm where he joined the demonstration to listen to speakers from Black Lives Matter Los Angeles ("BLM") and various other grassroots organizations.  At approximately 1:00 pm, plaintiff followed the group of demonstrators by taking to the City streets in peaceful protest.  The group traveled west on Beverly Boulevard and plaintiff and others would often stop at intersections, take a knee, and chant the names of George Floyd, Breonna Taylor, Ahmaud Arbery, and others.  Near the intersection of Beverly Boulevard and La Cienega Boulevard, the group split into two and plaintiff continued with the group that proceeded northwest towards West Hollywood.  The demonstration remained peaceful.

44.     Shortly thereafter, plaintiff and the group of demonstrators that he was with entered the City of West Hollywood and were stopped by a skirmish line of LASD deputies on foot on San Vicente Boulevard between Santa Monica Boulevard and Melrose Avenue.  On information and belief, these deputies are assigned to the

---

[23] *Id*. at *6, 7.

FIRST AMENDED COMPLAINT

Los Angeles County Sheriff's Department, West Hollywood Station.  The deputies began to indiscriminately yell at plaintiff and the group of protesters to "keep it moving … get out of the street … move out of the way" while they advanced on the crowd with batons in hand.

45.    At this point, plaintiff and the group turned southeast and returned to Beverly Boulevard where they proceeded east towards the Fairfax District.

46.    Close to the Columbia Broadcasting System ("CBS") parking lot (which was entirely occupied by law enforcement units and personnel) at the intersection of Beverly Boulevard and Fairfax Avenue, plaintiff encountered a large group of protesters.  Before long, law enforcement officers divided the demonstrators into two groups, with plaintiff following a crowd east on Beverly Boulevard.  Once plaintiff was positioned between North Curson Avenue and The Grove Dr./Stanley Avenue, a skirmish line of LAPD officers and LASD deputies formed at the intersection of Beverly Boulevard and The Grove Dr./Stanley Ave.  LASD deputies were also positioned on the roof of the nearby "Etz Jacob Congregation" with live ammunition rifles and LLMs aimed at the group of demonstrators.

47.    Over time, plaintiff observed a large number of officers and deputies—more than fifty—positioned close to the intersection.  In fact, Rimkunas recently testified that starting on May 30, 2020 (the day plaintiff was injured) "the entire sworn police force was mobilized" to respond to protests.  In the vicinity of where plaintiff was, law enforcement personnel were attired in full riot gear and brandished an array of LLMs as well as traditional firearms notwithstanding the continued peaceful demonstrations composed of unarmed protesters, including plaintiff.

48.    Without warning and for no apparent or justifiable reason, LASD deputies deployed tear gas into the crowd.  Plaintiff felt pain in his eyes, mouth, and nose from the tear gas, his eyes began to water, and he had difficulty seeing.  Plaintiff was able to treat the effects of teargas with liquid antacid and assisted fellow protesters affected by the gas with locating and applying milk.  The skirmish line of LAPD officers and

LASD deputies began advancing on plaintiff and the group of demonstrators (east on Beverly Boulevard) but would also retreat from the demonstrators (west on Beverly Boulevard).  Suddenly and without warning, LAPD officers, including Defendants Alvarado and Martinez, began firing rubber bullets and other LLMs at plaintiff and the crowd, while LASD deputies continuously deployed tear gas canisters into the crowd.

49.     At no point did LAPD officers or LASD deputies give plaintiff or other peaceful protesters in his area an order to disperse or clear the streets.  Plaintiff remained kneeling in the intersection, approximately 30 feet from the skirmish line and—with his hands up—shouted along with other demonstrators "hands up, don't shoot" and "I can't breathe."

50.     On at least one occasion, plaintiff attempted to negotiate with the officers and deputies holding the skirmish line by positioning himself between the line and urging them to cease pointing firearms at demonstrators in an effort to ease tensions between protesters and law enforcement.  Plaintiff requested of an unidentified commanding officer that the skirmish line not open fire so that plaintiff could take up position in the middle of the street to calm the protesters, and was informed by the apparent commanding officer that plaintiff was free to do so.  However, as plaintiff approached the group of protesters, he was fired upon and hit by sponge grenades discharged by the skirmish line of law enforcement.[24]

---

[24] Also known as "foam rounds", such LLMs used by the LAPD during recent protests have resulted in serious physical injury.  *See Woman Sues LAPD, Saying Foam Rounds Injured Her* (LA TIMES, June 16, 2020), available at: https://www.latimes.com/california/story/2020-06-16/woman-driving-near-protests-files-claim-against-lapd-foam-round.

15

FIRST AMENDED COMPLAINT

51.     Subsequently, LAPD officers, including Officers Alvarado and



*LAPD Produced Video released July 31, 2020*

Martinez,aimed their weapons directly at plaintiff and simultaneously fired upon him, hitting him on the hip and stomach, with two rubber bullets. Plaintiff sought shelter behind a billboard located on the sidewalk to protect himself from further rubber bullets and other projectiles.  After a couple of minutes, plaintiff re-emerged from this position and entered the street with his hands held above his head. Bodycam footage released by the LAPD on July 31, 2020[25] shows plaintiff slowly retreating away from the skirmish line, when he is fired at and hit with a 40 mm LLM rubber bullet on the front, left side of his head.[26]  Upon impact, plaintiff grabbed his head and fell downward, thereby injuring his tailbone.

_____

[25] https://www.youtube.com/watch?v=7fL5S0Po4rA&feature=youtu.be

[26] A 2017 review published by the British Medical Journal ("BMJ") examined 26 papers on rubber bullet injuries, covering a total of 1,984 injuries.  *See* Haar, R., et al., *Death, Injury and Disability From Kinetic Impact Projectiles in Crowd-Control Settings: A Systematic Review* 7 BMJ OPEN 1-9 (2017), available at: https://bmjopen.bmj.com/content/bmjopen/7/12/e018154.full.pdf.  The review found that 300 of those injuries resulted in permanent disabilities, especially if the bullet struck the head or neck.  *Id*. at 1.  Within this group, 53 people (3%) died from rubber-bullet related injuries.  *Id*.  Indeed, the LAPD is aware that LLMs such as sponge grenades should never be fired upon most parts of the upper body, including the chest, neck, head, groin, kidneys and spine.  *See LAPD Less-Lethal Devices* (YOUTUBE, October 17, 2017), available at https://www.youtube.com/watch?v=CJwqX_qwchU; *see also* Angelina Chapin, *What it Feels Like to Be Shot by a Rubber Bullet* (The Cut, May 31, 2020) ("These rounds were originally designed to be aimed at the ground to help disperse a crowd, but when shot directly at a body, they can lead to serious injuries like cracked ribs, a fractured skull, or concussion."), available at: https://www.thecut.com/2020/05/what-does-a-rubber-bullet-feel-like.html#:~:text=These%20rounds%20were%20originally%20designed,done%20at%20%20protests%20across%20America.

FIRST AMENDED COMPLAINT

52.     Plaintiff became immediately incapacitated after being struck in the head by the rubber bullet, started bleeding profusely, lost all vision in his left eye, felt ringing in his ears, and pain radiating throughout his head.  While he was on the ground, LAPD officers and LASD deputies continued to fire projectiles and tear gas into the crowd.  Some demonstrators rushed to assist plaintiff, applied gauze, and wrapped his head wound while other demonstrators attempted to call for emergency services.

53.     The demonstrators that helped plaintiff were unable to place outgoing calls—reportedly due to law enforcement transmitting "scrambler" signals to interrupt communication amongst protesters—and as a result, helped carry plaintiff away from the area.  Ultimately, an individual drove plaintiff to Cedars-Sinai, the nearest hospital.

54.     At approximately 6:30 pm, plaintiff arrived at the Intensive Care Unit ("ICU") at Cedars-Sinai where he was triaged and given emergency medical treatment for his injuries.  When the bleeding finally stopped, plaintiff received 7-8 staples on his forehead, as hospital staff reported that they could see his skull beneath the skin torn open by the rubber bullet, and he received a CT scan of his brain.



FIRST AMENDED COMPLAINT

55.   Hospital staff informed plaintiff that he had suffered a brain bleed and that he was at risk of seizures and serious infection.  Plaintiff was prescribed, among other treatments, pain killers, anti-seizure medication, and upon discharge a cane to prevent him from losing his balance as a result of his serious brain injury.  Plaintiff spent 4 days at Cedars-Sinai, 2 of which were spent in the hospital's ICU.

56.   Plaintiff's injuries are still being evaluated by medical professionals.  As a direct and proximate result of being shot by law enforcement personnel, plaintiff suffered a serious laceration to his head, a concussion, including a brain bleed, and an injury to his tail bone.  As a further direct and proximate result, plaintiff continues to experience, *inter alia*, post-concussion syndrome, hearing loss, recurrent dizziness, nausea, mental confusion and inability to comprehend social cues, significantly reduced proficiency in understanding written and spoken language, is easily disturbed when hearing music (which causes great distress given that he is currently enrolled as a music student at the Los Angeles Recording School), and suffers from emotional distress.

57.   On the night that plaintiff suffered these devastating injuries, at approximately 7:00 pm, the City implemented the first citywide curfew that continued to be enforced over a series of days.  The citywide curfew on May 30, 2020 did not go into effect until 8:00 pm, well after plaintiff was indiscriminately fired upon by the LAPD and LASD.

58.   The decision to exercise unreasonable force by deploying LLMs against plaintiff and the crowd of peaceful demonstrators was, as Rimkunas testified, recommended and authorized by Rimkunas, in consultation with Assistant LAPD Chief Robert Arcos and Deputy LAPD Chief Vito Palazzolo and ratified by Moore (who, upon information and belief, was also present at the May 30 Fairfax demonstration).  As the Incident/Watch Commander in charge of "A Watch" (6 a.m. to 6 p.m.) at the scene of the Fairfax demonstration, Rimkunas testified that the use of

LLMs against protesters was authorized at or around 2 p.m. and continued well beyond the time that plaintiff was injured.

59.     Similarly, Captain Paulson and Sergeants Cruz, Bunch, and Gutierrez ordered LAPD officers to deploy LLMs in the area between North Curson Avenue and The Grove Dr./Stanley Avenue, where plaintiff was injured.

## MONELL ALLEGATIONS

60.     Plaintiff incorporates by reference each preceding allegation as if fully set forth herein and further alleges:

61.     Based upon the principles established in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), defendants are liable for all injuries sustained by plaintiff as set forth herein.  The City and County have failed to train their officers and deputies in the constitutional responses to peaceful demonstrations, and their officers' and deputies' actions were the result of custom, policy, or practice, inadequate supervision, instruction, and discipline.  The City and County have condoned the Constitutional rights violations and abuses that are the subject of this action and have thereby encouraged and ratified such conduct.

62.     The LAPD and LASD engaged in violations of law, as outlined above, by interfering with the exercise of First Amendment speech through the use of indiscriminate and excessive and unreasonable force against plaintiff.  The excessive and unreasonable force inflicted upon plaintiff by the LAPD and LASD occurred through the use of rubber bullets and other LLMs while plaintiff was peacefully demonstrating on May 30.

63.     Specifically, the Doe officers and Deputies fired rubber bullets and other forms of LLMs at plaintiff, thereby incapacitating plaintiff and causing severe and permanent physical injuries.  The use of LLMs by the Doe officers was authorized by Rimkunas in consultation with Assistant LAPD Chief Arcos and Deputy LAPD Chief Palazzolo and ratified by Moore.

64.     In conjunction with defendants' long history of protest-related constitutional violations as alleged in this Complaint, each defendants' repeated unlawful acts on May 30, 2020 constitute a *de facto* policy, practice, and/or custom of violating protesters' constitutional rights, including the constitutional rights of plaintiff.  Such policy, practice, and/or custom was the direct and proximate cause of plaintiff's injuries.

65.     As Chief of the LAPD, Moore was fully knowledgeable and apprised of these actions and, upon information and belief, was present during the May 30 demonstration in the Fairfax District, observing and directing the operation of his officers, without repudiating or stopping the actions of the LAPD officers, thereby ratifying them.  Moreover, in his reports to the Police Commission and in other public statements, Moore stated repeatedly that the actions of the LAPD officers were proper.

66.     As Sheriff of the LASD, Villanueva was fully knowledgeable and apprised of the actions that harmed plaintiff and, upon information and belief, observed and directed the operation of his deputies, without repudiating or stopping the actions of the LASD deputies, thereby ratifying them.

67.     To the extent he did not make the decision and approve the plan himself, Moore delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to the May 30, 2020 assembly in the Fairfax district, specifically at the site where plaintiff was injured.  In fact, Rimkunas explicitly testified that "as the Deputy Incident Commander for the civil unrest in the City of Los Angeles from May 29, 2020 to June 10, 2020, that followed the death of George Floyd…[and] as the Incident Commander, I made decisions in consultation with Assistant Chief Robert Arcos and Deputy Chief Vito Palazzolo on the deployment of resources in the field on a city-wide basis, including LLMs, putting up blocking forces and barriers, and setting up skirmish lines, among other things." The persons who made these decisions acted as the delegated policy maker for the City of Los Angeles on these issues.

68.     On information and belief, to the extent he did not make the decision and approve the plan himself, Villanueva delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to the May 30, 2020 assembly in the Fairfax district, specifically at the site where plaintiff was injured.  The persons who made these decisions acted as the delegated policy maker for the County of Los Angeles on these issues.

69.     The City and County have failed to train their officers and deputies in the appropriate constitutional responses to peaceful demonstrations.  Specifically, defendants failed to provide adequate training for: 1) proper crowd control and dispersal methods; and 2) proper use of LLMs in crowd control tactics.

70.     Upon information and belief, the City and County maintain policies, including the routine use of tactics, that are escalatory by nature, including the use of rubber bullets, riot gear, and other LLMs at demonstrations and protests for crowd control purposes, thereby placing demonstrators such as plaintiff at risk of serious injury.  The City and County's escalatory and dangerous policies and practices include, *inter alia*, hosting training for their officers and deputies in "killology"—which, as described above, advocates the free, and often indiscriminate, use of deadly force by law enforcement.

71.     Moreover, the County, through Villanueva and the LASD, has failed to address the historically entrenched problem of "sheriff gangs" amongst its deputies and other officials.  The gangs—operating without accountability, restraint, or fear of discipline and/or reprimand—contribute to the violent and irresponsible culture of employing excessive force against members of the public, including peaceful protesters such as plaintiff.

72.     The rights of plaintiff that were violated in the instant matter were clearly established long before the incident on May 30, 2020.

73.     Upon information and belief, the City and County participate in the California Commission on Peace Officer Standards and Training ("POST").  As

participating agencies, defendants agree to abide by the standards established by POST.  Defendants' conduct, as alleged herein, failed to comply with POST guidelines on crowd management, intervention, and control.

74.     The need for training and discipline to enforce constitutional guarantees in peaceful demonstrations is obvious, yet defendants have failed to promulgate adequate policies in accordance with federal law and/or to train its command staff and officers on appropriate policies, if any exist.

75.     The City is well aware of its constitutional duties in these circumstances in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *Multi-Ethnic Worker Organizing Network v. City of Los Angeles. City of Los Angeles*, as well as other settlements entered into specifying these constitutional duties over the years.  Indeed, merely two weeks prior to George Floyd's murder, a federal district court judge entered a final judgment against the City of Los Angeles in a class action settlement involving City's unconstitutional crowd control tactics during protests following the Ferguson Grand Jury decision not to indict the officer who shot and killed Michael Brown.  *See Charmaine Chua, et al. v. City of Los Angeles, et al*., 2:16-CV-00237 (C.D. Cal. 2020).

76.     Likewise, the County has repeatedly been sued in the past for similar constitutional violations and, specifically, the use of excessive force in the deployment of crowd control tactics such as rubber bullets and other forms of LLMs.  *See Lomeli v. Cty. of Los Angeles,* No. 2:10-CV-9963-ODW CWX, 2012 WL 682879 (C.D. Cal. Mar. 1, 2012) ("the Deputies never warned [plaintiff] that they would use the SL6 round against him if he continued passively resisting arrest. Notwithstanding the report that [plaintiff] previously had been armed, the Court cannot accept that shooting a non-lethal SL6 round at an unarmed suspect who is lying face up on the ground and has not been physically or verbally aggressive is a reasonable use of force. Precedent supports the Court's position.").

77.     The City has known of the deficiencies in the training of its officers in such circumstances since at least 2000 and entered into a settlement agreement in June 2005 and June 2009, each time agreeing to revised policies and training, yet the City has failed to promulgate adequate policies effectuating the terms of the settlement agreement and/or to train its command staff and officers on the revised policies, if any exist.  This constitutes a separate *Monell* violation from those outlined above.

**I.      The Settlement in *National Lawyers Guild v. City of Los Angeles***

78.     In June, 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000.  The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

79.     Significantly, the settlement addressed the use of LLMs and chemical irritants to disperse peaceful protesters.  Also, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals.

**II.    The Settlement in *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* ("*MIWON*")**

80.     On May 1, 2007 ("May Day"), the LAPD assaulted a peaceful, permitted immigration march in the MacArthur Park area of Los Angeles.  Like here, the attack on demonstrators was without warning.  No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly.  During the course of litigating the *MIWON* action, the LAPD conceded that it had not

fully implemented training and policy orders regarding the *NLG* settlement two years earlier.  In fact, no policy changes were ever finalized.

81.    On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of the class action lawsuit brought on behalf of all those subjected to the LAPD's May Day action.

82.    In a section titled "Use of Less Lethal Weapons", the Order states:

    a.  Less-lethal munitions may be deployed on ***aggressive and/or combative suspects*** in a crowd control situation, on suspects who are a ***potential physical threat*** to themselves or others, or suspects displaying 'aggressive' and/or 'combative' actions.

    b.  For the purpose of deployment of less-lethal munitions, 'aggressive' and/or 'combative' actions include ongoing destruction of property that presents a threat to the personal safety of officers or others.

    c.  Less lethal weapons should not be used on a lawfully dispersing crowd or individual.

    d.  Less lethal weapons ***should not be used against a person or a crowd that is retreating*** unless the person or crowd continues to engage in unlawful activity that is aggressive and/or combative.

    e.  Where feasible, ***notice should be given to the crowd before less lethal weapons are deployed*** in a crowd control or dispersal situation, and where feasible, it should be given in the language(s) spoken by those assembled.

    f.  If the LAPD resumes the use of stinger rounds, the LAPD will publish a notice that will require that less-lethal stinger weapons can be used only with the approval of a staff officer (i.e., commander or above) and only in a riotous situation where the use of lethal force would not be reasonable.

(emphasis added).

83.    As demonstrated throughout this Complaint, *none* of the conditions authorizing the use of LLMs in the Order existed when plaintiff was struck and injured

by rubber bullets on May 30, 2020.  In stark contrast to being "aggressive", "combative" or posing a "physical threat" to himself or others, plaintiff remained peaceful throughout the course of his participation in the May 30 demonstration and, unarmed, had his hands up—a clear and unequivocal sign of non-threat—when he was assaulted and battered by LLMs.

84.   Moreover, the Order set out specific requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the crowd to record the officer; if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable period of time to disperse and identification of "a clear and safe route" to follow to disperse.  The order should be given so that it is heard by the entire crowd.  These requirements were not met in this instance at the location(s) where plaintiff was demonstrating and at the site where he sustained injuries.  At no time did plaintiff receive a dispersal order or warning prior to being shot and injured.

85.   The terms of the *MIWON* structural relief agreement were to be included in the LAPD's Crowd Control and Use of Force Manuals and every officer at the rank of Sergeant I and above, as well as the entire Metropolitan Division, were to undergo training every two years.  Moore, as well as those members of his command staff to whom he has delegated his responsibility to enact and implement lawful policies for responding to demonstrations, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlement in *National Lawyers Guild v. City of Los Angeles* in June 2005.

86.   Moreover, Moore and his delegated command staff were at all relevant times aware that the use of unlawful or inadequate dispersal orders and LLMs—such as rubber bullets—to break up lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD that it was critical for leadership to ensure that official policy was trained and implemented in a manner sufficient to address the custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild*

25

FIRST AMENDED COMPLAINT

settlement agreement.  The failure to take these necessary steps directly and proximately lead to the injuries suffered by plaintiff in the instant matter.  This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

## PUNITIVE/EXEMPLARY DAMAGES ALLEGATIONS

### (Against individual Defendants Moore, Villanueva, Rimkunas, Alvarado, Martinez, Cruz, Bunch, Paulson, Gutierrez and Does 7-10)

87.     Each defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants, and each of them, were fully aware of the serious and demonstrable risk of serious bodily injury and death associated with deploying LLMs against peaceful protesters such as plaintiff, and that such risks are compounded when used to strike vulnerable and sensitive parts of plaintiff's person with rubber bullets—such as his head and stomach.  With full knowledge of such risks, and that the use of LLMs in such circumstances is unlawful, defendants proceeded to unlawfully fire LLMs at plaintiff and/or recommend, authorize, and ratify the use of LLMs against plaintiff, all of which resulted in plaintiff sustaining severe physical, mental and emotional harm.

88.     Defendants authorized and executed the unlawful deployment of LLMs with malice and with the specific intent to injure, debilitate, and incapacitate plaintiff physically and to deny, impede and constrain plaintiff's Constitutional rights and dissuade plaintiff from participating in future demonstrations.

89.     The defendant officers and deputies, and each of them, acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Does 6-10, liable for punitive damages under California Civil Code § 3294.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

90.    On June 24, 2020, Plaintiff timely filed a claim with the City pursuant to Cal. Gov't Code § 910 *et seq*.  On August 10, 2020, and not having received a response from City, the claim was denied by operation of law permitting the filing of this complaint.

91.    On June 24, 2020, Plaintiff timely filed a claim with the County pursuant to Cal. Gov't Code § 910 *et seq*.  On August 10, 2020, and not having received a response from City, the claim was denied by operation of law permitting the filing of this complaint.

**FIRST CAUSE OF ACTION**

**Free Speech and Assembly**

**First & Fourteenth Amendments (42 U.S.C. § 1983);**

**California Constitution, Article I, §§ 2 & 3**

**(Against all Defendants)**

92.    Plaintiff realleges and incorporates herein by reference each of the

93.    preceding paragraphs of this complaint, and all of the subsequent paragraphs.

94.    Upon information and belief, defendants were acting jointly and in concert in taking the actions alleged.

95.    Defendants' above-described conduct violated plaintiff's rights to freedom of speech and assembly under the First Amendment to the United States Constitution and the analogous provisions of the California Constitution.

96.    Defendants' actions violated plaintiff's clearly established rights to freedom of expression and assembly under the First Amendment to the United State Constitution by prohibiting plaintiff from exercising his constitutional rights to free speech and expression in a public forum.

97.    Specifically, defendants inhibited and chilled plaintiff's First Amendment activity by incapacitating and injuring him with LLMs when plaintiff was engaged in a peaceful demonstration at a public forum, protesting police violence and the continued oppression of communities of color in the United States.  Plaintiff's protected First

27

Amendment activity was a substantial or motivating factor in defendants' use of force intended to chill plaintiff's speech.

98.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe and lasting physical injury, mental and emotional distress, and humiliation, some of which may be permanent, and is entitled to monetary damages for each of said losses and damages.

99.   As a further direct and proximate result of the acts and conduct of defendants, and each of them, as herein alleged, plaintiff has incurred, and on information and belief, will incur for an indefinite time in the future, medical, hospital and related expenses, all in a sum presently unascertained, but according to proof at the time of trial.

100.   As a further direct and proximate result of the acts and conduct of defendants, and each of them, as herein alleged, plaintiff has suffered loss of  income and loss of earning capacity, all in a sum presently ascertained, but according to proof at the time of trial.

101.   Defendants knew or should have known that prohibiting plaintiff from exercising his constitutional rights to free speech and expression in a public forum were clearly established violations of the First Amendment at the time of the incident.

102.   The defendant officers and deputies acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Does 6-10, liable for punitive damages under California Civil Code § 3294.

## SECOND CAUSE OF ACTION

### Unlawful Seizure & Excessive Force

### Fourth & Fourteenth Amendments (42 U.S.C. § 1983);

### California Constitution, Article I, § 13

#### (Against all Defendants)

103.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs, and all subsequent paragraphs of this Complaint.

104.    Defendants' above-described conduct violated plaintiff's rights to be free from unreasonable seizures and excessive force, in violation of the Fourth Amendment to the United States Constitution and the analogous provisions of the California Constitution.

105.    With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants intentionally and unlawfully seized plaintiff's persons by restraining plaintiff with the use of LLMs such as rubber bullets and other projectiles, in a manner that resulted in plaintiff being incapacitated and unable to leave.  Defendants could not have reasonably believed that plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, and engaged in lawful First Amendment activity when he was intentionally shot in the head and body by rubber bullets.

106.    With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants used excessive a force on plaintiff by unjustifiably firing rubber bullets at plaintiff and striking plaintiff in the head and body, causing severe physical injury when there was no reason to so restrain a peaceful demonstrator such as plaintiff.

107.    Defendants knew or should have known that using excessive force against plaintiff in this manner and detaining plaintiff without reasonable suspicion or probable cause was a clearly established violation of the Fourth Amendment at the time of the incident.

108.    As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages.

109.    Plaintiff intends to continue attending and participating in protests in the future but fears further assault and other retaliation by law enforcement.  That fear inhibits plaintiff from participating in demonstrations.

110.   The defendant officers and deputies acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Does 6-10, liable for punitive damages under California Civil Code § 3294.

### THIRD CAUSE OF ACTION

### Substantive Due Process

### Fourteenth Amendment (42 U.S.C. § 1983);

### California Constitution, Article I, § 13

**(Against all Defendants)**

111.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

112.   Defendants' above-described conduct violated plaintiff's right to substantive due process of law, in violation of the Fourteenth Amendment to the United States Constitution and the analogous provisions of the California Constitution.

113.   Specifically, Defendants' conduct in unjustifiably firing LLMs at plaintiff and striking plaintiff in the head and body, causing severe physical injury, while plaintiff was peacefully engaged in protected First Amendment activity was shocking to the conscious, beyond the bounds of acts tolerable in a civilized society, and so egregious and outrageous that may fairly be said to shock the contemporary conscience.

114.   Defendants' conduct in unjustifiably firing LLMs at plaintiff and striking plaintiff in the head and body, causing severe physical injury, while plaintiff was peacefully engaged in protected First Amendment activity was maliciously and sadistically done for the very purpose of causing harm to plaintiff.

115.   Defendants knew or should have known that using excessive force against plaintiff in this manner was a clearly established violation of the Fourteenth Amendment at the time of the incident.

116.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe and permanent physical injury, emotional distress, and humiliation, and is entitled to monetary damages.

117.   Plaintiff intends to continue attending and participating in protests in the future but fears further assault and other retaliation by law enforcement.  That fear inhibits plaintiff from participating in demonstrations.

118.   The defendant officers and deputies acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Does 6-10, liable for punitive damages under California Civil Code § 3294.

## FOURTH CAUSE OF ACTION
### Violation of Bane Act (California Civil Code § 52.1)
### (Against all Defendants)

119.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

120.   Plaintiff brings this cause of action against all defendants by operation of state law.  Plaintiff has complied with the California Tort Claims Act requirements as fully set forth above.

121.   All defendants, and each of them, by doing and/or causing the acts complained of in this entire Complaint, interfered by threats, intimidation, or coercion, with the exercise and enjoyment of plaintiff's rights as secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution and laws of the United States, and the rights secured by the Constitution and laws of the State of California.

122.   Defendants engaged in threatening, intimidating, and coercive tactics by using excessive force against plaintiff with LLMs while plaintiff was lawfully present at a peaceful demonstration, and thereby chilling his First Amendment activity.  There was no lawful justification for defendants to threaten, intimidate, or coerce plaintiff or to attempt to use threats, intimidation, or coercion to interfere with plaintiff's rights to lawfully participate in a peaceful demonstration.

123.   Defendant entities City of Los Angeles and County of Los Angeles are liable to plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of *respondent superior*, codified at California Government Code § 815.2.

124.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages, including statutory damages, and attorneys' fees.

125.   Plaintiff intends to continue attending and participating in protests in the future but fears further assault and other retaliation by law enforcement.  That fear inhibits plaintiff from participating in demonstrations.

126.   The defendant officers and deputies acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Does 6-10, liable for punitive damages under California Civil Code § 3294. ///

## FIFTH CAUSE OF ACTION
### Assault
### (Against all Defendants)

127.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

128.   This cause of action arises under the general laws and Constitution of the State of California.  Plaintiff has complied with the California Tort Claims Act requirements.

129.   As described in detail herein above, defendants Alvarado, Martinez, and Does 6-10 assaulted plaintiff by acting intentionally to place plaintiff in reasonable apprehension of immediate harmful or offensive contact by, *inter alia*, aiming LLMs and live firearms at plaintiff, firing LLMs at plaintiff, hitting plaintiff with rubber bullets, and using force upon plaintiff, and had the present ability to cause such contact.

130.   As a direct and proximate result of the acts and conduct of defendants, and each of them, at the time and place herein alleged, plaintiff suffered fear of immediate harmful or offensive touching by LLMs or other weapons wielded by defendants, and each of them.

131.   Plaintiff intends to continue attending and participating in protests in the future but fears further assault and other retaliation by law enforcement.  That fear inhibits plaintiff from participating in demonstrations.

132.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered the injuries and damages as herein alleged. The defendant officers and deputies acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Alvarado, Martinez,  and Does 6-10, liable for punitive damages under California Civil Code § 3294.

///

///

## SIXTH CAUSE OF ACTION

### Battery

#### (Against all Defendants)

133.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

134.   This cause of action arises under the general laws and Constitution of the State of California.  Plaintiff has complied with the California Tort Claims Act requirements.

135.   Defendants Alvarado, Martinez, Does 6-10, and each of them, battered plaintiff, as alleged in this complaint, when said defendants acted intentionally to cause, and did cause, said non-consensual, unprivileged, unjustified, excessive, harmful, or offensive contact to plaintiff's person by hitting plaintiff with LLMs on

FIRST AMENDED COMPLAINT

various parts of plaintiff's person, including the head and torso, and causing plaintiff the injuries and damages as herein alleged.

136.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered the injuries and damages as herein alleged.

137.   Plaintiff intends to continue attending and participating in protests in the future but fears further assault and other retaliation by law enforcement.  That fear inhibits plaintiff from participating in demonstrations.

138.   The defendant officers and deputies acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including Alvarez, Martinez, and Does 6-10, liable for punitive damages under California Civil Code § 3294.

## SEVENTH CAUSE OF ACTION

### Negligence

### (Against all Defendants)

139.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

140.   This cause of action arises under the general laws and Constitution of the State of California.  Plaintiff has complied with the California Tort Claims Act requirements.

141.   For purposes of this cause of action only, allegations are deemed to sound in negligence, and set forth pursuant to California Civil Code Section §1714 and California common law.

142.   At all times material herein, defendants—as law enforcement agencies and personnel charged with executing their duties without the threat of unreasonable risk to plaintiff—and each of them, had a duty to  act reasonably to avoid, or foresee, the risk that said defendants themselves, or their colleagues or subordinates, would commit the acts complained of herein, including but not limited to: (a) encountering and physically harming a person such as plaintiff participating in a peaceful

demonstration and (b) authorizing and using LLMs inappropriately as crowd control devices.

143.   Defendant entities City of Los Angeles and County of Los Angeles, and each of them, had a duty to act reasonably to foresee and avoid the risk that said defendants themselves, or their colleagues or subordinates, would commit the acts complained of herein.

144.   Defendants, and each of them, breached their duty of care by not acting reasonably under the circumstances of such risk, as described herein above, and/or by impeding otherwise curtailing the civil rights of, or endangering, without lawful basis, plaintiff.

145.   Specifically, defendants Alvarado, Martinez, Does 6-10, and each of them, breached their duty of care and failed to act toward plaintiff as a reasonable law enforcement officer and/or deputy would in similar circumstances by firing LLMs at plaintiff—a peaceful demonstrator—and/or failing to take proper precautions when using such unwarranted crowd control tactics by, *inter alia*, aiming and firing straight at plaintiff on parts of plaintiff's person which should not be targeted by LLMs, including but not limited to the head and stomach.  At all times herein relevant, other less dangerous and intrusive crowd control tactics were available to each defendant.

146.   Individual defendants Moore, Villanueva, and Rimkunas breached their duty of care and failed to act as a reasonable law enforcement official would in similar circumstances by recommending, authorizing and ratifying the use of LLMs and other weapons against plaintiff when other less dangerous and intrusive crowd control tactics were available, and/or recommending, authorizing, and ratifying the use of LLMs against plaintiff in an improper manner such as striking parts of plaintiff's person that should not be targeted by LLMs, including but not limited to the head and stomach.

147.   At all times herein relevant, defendants, and each of them, failed to follow established guidelines, rules and procedures—including their own—for the use of

LLMs and crowd control tactics, and the City specifically breached its court-ordered mandate issued in *MIWON* related to the use of force at demonstrations.

148.   At all times herein relevant, defendant entities City of Los Angeles, County of Los Angeles, and individual defendants Moore, Rimkunas, and Villanueva, and each of them, breached their duty of care by not acting reasonably under the circumstances of such risk, as described herein above, and/or by failing to discharge their respective duties to appropriately screen and train their employees, investigate and discipline their employees for misconduct, and acting negligently by authorizing and ratifying the use of LLMs, and providing improper training that condoned the escalatory and dangerous tactics employed by Alvarado, Martinez, and Does 6-10 which resulted in harm to plaintiff.

149.   Each defendant's aforesaid breaches of duty were each a direct and proximate cause of the injuries and damages suffered by plaintiff, as alleged in this complaint.

150.   Defendant entities City of Los Angeles and County of Los Angeles are liable to plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of *respondent superior*, codified at California Government Code § 815.2.

## **REQUEST FOR RELIEF**

Wherefore, plaintiff respectfully requests that the Court enter a judgment as follows:

i.   A declaratory judgment that defendants' conduct detailed herein was a violation of plaintiffs' rights under the Constitutions and laws of the United States and California;

ii.   To the extent that the Court finds that defendants' conduct was authorized by custom, policy, or practice, and/or the inadequate training, supervision, instruction and discipline, a declaratory judgment that those customs, policies, or practices, and/or the inadequate trainings, supervisions,

36

FIRST AMENDED COMPLAINT

instructions and disciplines are unconstitutional under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the analogous provisions of the California Constitution;

iii. Permanent injunctive relief to preclude similar acts by defendants at future demonstrations.

iv. An award of past and future economic damages against all defendants for the harms sustained by plaintiff in an amount to be determined according to proof at the time of trial;

v. An award of general damages against defendants, and each of them, for the physical, mental and emotional damages, past and future, according to proof at the time of trial;

vi. An award of punitive and exemplary damages against the individual defendants in an amount to be determined according to proof at the time of trial;

vii. An award of attorneys' fees pursuant to 42 U.S.C. §§ 1983, 2986, 1988, 12205 and Cal. Civil Code §§ 52.1, 52(b)(3) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5, and any other applicable provisions, and

viii. Costs of suit, pre and post-judgment interest as permitted by law; and any such other relief as the Court may deem just and proper.

Respectfully submitted,

Dated:  June 22, 2021          **BAUM HEDLUND ARISTEI & GOLDMAN, P.C.**

By:  /s/ Pedram Esfandiary
Pedram Esfandiary, Esq.
pesfandiary@baumhedlundlaw.com
Monique Alarcon, Esq.
malarcon@baumhedlundlaw.com
Timothy A. Loranger, Esq.
tloranger@baumhedlundlaw.com
Ronald M. Goldman, Esq. (SBN: 33422)
rgoldman@baumhedlundlaw.com

37

1

2

**BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.**
10940 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90024
Telephone: (310) 207-3233

3

4

5

*Attorneys for Plaintiff*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully demands that a jury trial be conducted with respect to all issues and claims.


Respectfully submitted,

Dated:  June 22, 2021          **BAUM HEDLUND ARISTEI & GOLDMAN, P.C.**


By:  /s/ Pedram Esfandiary
Pedram Esfandiary, Esq.
pesfandiary@baumhedlundlaw.com
Monique Alarcon, Esq.
malarcon@baumhedlundlaw.com
Timothy A. Loranger, Esq.
tloranger@baumhedlundlaw.com
**BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.**
10940 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90024
Telephone: (310) 207-3233

*Attorneys for Plaintiff*

FIRST AMENDED COMPLAINT